Filed 6/10/16  P. v. Gonzalez CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E061347 |
| v. | (Super.Ct.No. RIF1300092) |
| ENRIQUE FLORES GONZALEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Ronald L. Taylor, Judge. (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Thea Greenhalgh, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Anthony DaSilva and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Enrique Flores Gonzalez appeals his conviction on three counts of making criminal threats and one count of false imprisonment by force or violence. He contends that the evidence was insufficient as to three counts, and that the jury instructions on the false imprisonment charge were deficient. We will affirm the judgment.

PROCEDURAL HISTORY

Defendant was charged with three counts of making criminal threats in violation of Penal Code[1] section 422 (counts 1, 2, 3; victims Garcia, Singh, and Gonzalez, respectively) and one count of felony false imprisonment in violation of section 236 (count 4; victim Zavaleta). A jury found defendant guilty on all counts as charged. The trial court sentenced defendant to an aggregate term of four years in state prison.

Defendant filed a timely notice of appeal.

FACTS

Defendant, working in concert with two other men, illegally brought Maria Zavaleta and several other people into California from Mexico. They placed Zavaleta and one other woman in a motel room in Temecula. Zavaleta needed to contact her mother to arrange for payment of the fee. Defendant and the others refused to buy her a phone card so she could call her mother. The other woman was able to arrange for payment and left the motel. Zavaleta testified that she was not afraid until one of the other men put her hands behind her back and said they were going to take her somewhere

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

else. She was alone with them by then and was afraid they would take her somewhere and rape her. The man was unable to remove her from the motel room at that point because there were other people outside in the hallway.

Nestor Garcia, who was a member of the motel's cleaning staff, saw Zavaleta peek out the window of one of the motel rooms. Zavaleta indicated that she needed help, but Garcia did not respond. A few minutes later, Zavaleta opened the door and said she needed help. She was shaking and appeared to be afraid. When Garcia asked if she was okay, Zavaleta told him to shut up and "closed the door scared." Garcia saw defendant leave room 118 and enter room 117, where Zavaleta was. Defendant then left and went back into room 118. Shortly after that, Zavaleta opened the door again and told Garcia that she had been kidnapped. Zavaleta asked Garcia to help her escape. She told him she had crossed from Mexico into the United States and that "they" had threatened her and that "they" were very bad.

Garcia and Zavaleta ran to the motel office. Yosio Gonzalez, the motel secretary, was there. They explained that Zavaleta needed help, and Gonzalez told her to hide in a small room behind the office. Garcia felt "there was [going to] be a big problem" because a person who "crosses other people could be a dangerous one."[2] Garcia asked Gonzalez to call the police, but Gonzalez did not do it because she did not think there would be a big problem.

---

[2] In context, it is clear that Garcia was referring to a person who brings people across the border illegally.

After Zavaleta was hidden in the room behind the office, Garcia went back outside and continued cleaning the pool. He saw defendant and another man approaching from the area of room 118. Defendant looked "angry, excited, but . . . scared at the same time." Garcia did not think defendant was angry at him. Defendant asked if Garcia had seen Zavaleta. Defendant sounded angry, and told Garcia he would give him money if he told him where Zavaleta was. Defendant said that he had "crossed" Zavaleta and that she owed him money. When Garcia said he did not know where Zavaleta was, defendant told him to "watch [his] back." Garcia interpreted that statement as a threat, and he felt afraid.[3] Garcia was afraid of the possibility of being physically harmed when he later saw defendant come out of the motel office looking even angrier than before. Garcia saw defendant and one of the other men go into room 118 and come out with their belongings. They left the motel property.

Gonzalez testified that when Garcia brought Zavaleta into the motel office, Zavaleta was "really, really bad," crying, yelling, asking her for help. She appeared to be "really afraid." Zavaleta said she was "scared for her life," that she was being held against her will, and that "they were hurting her in that room." Gonzalez hid Zavaleta in the back laundry room adjacent to the office, called a phone number Zavaleta had given her, and told "them" what was going on. After Gonzalez put Zavaleta in the laundry room, defendant came into the office. His demeanor was calm. He looked around the

---

**3** Garcia testified through an interpreter. He explained that the Spanish expression defendant used could mean "take care of yourself" if used between friends or family members, but when used by a stranger, it has a threatening connotation.

4

office "like, looking to see if there were other rooms in that room." Defendant then approached Gonzalez and said, "I know you have her. Tell me where she's at. I will be—I'll be watching what you're doing. I know what you drive." Defendant also said words to the effect of "watch [your] back," and told Gonzalez that she was "messing with [his] money." When Gonzalez told defendant she did not know what he was talking about, he left the office. Gonzalez felt threatened by the exchange, especially when she saw via the security camera that defendant and his companions appeared to be searching the parking lot. Gonzalez felt that they would "do something" to her if she did not give Zavaleta back to him.

The other two men came into the office after defendant left. They cussed at Gonzalez, demanding to know where Zavaleta was. They said they knew Gonzalez had her. Gonzalez was separated from the men by glass that "protect[s] [her] from people," but she felt that the threat "could happen at any time." Gonzalez felt this because of "the way they were being, their faces, their actions, how they were."

After the men left the office, Gonzalez saw all three of them running toward the gas station across the street from the motel. Gonzalez called the police, who responded. She never saw any of the men again.

Avineet Singh, the manager of the motel, had left the office before Garcia brought Zavaleta there. When he returned, both Garcia and Gonzalez were in the office. They told him that Zavaleta had come to them for help and that "she was human traffick[ed] by so and so person." They said that defendant and some others had brought her from Mexico. They were afraid to call the police, but they did not tell him why they were

5

afraid. Singh went outside and saw defendant and another man looking around the parking lot. After they left, Singh took his car to the gas station across the street. When he attempted to enter the gas station store, he was "cornered" by defendant and two other men. Defendant asked where the girl was. He accused Singh of wanting to make money off her. He told Singh to return her or he would shoot him. Singh took the threat seriously. When the men moved aside to let another customer enter the store, Singh followed the customer and then exited the store by another door. Singh ran back to his car and returned to the motel. The police arrived shortly after he returned. At some point, Singh saw one of the "other guys," not defendant, knocking on the door of his apartment at the motel.

Both Garcia and Gonzalez were afraid that defendant and the others would return and hurt them. Garcia quit his job at the motel four to six weeks later. Gonzalez stayed away from work for a week after the incident.

Dario Hernandez, a deputy sheriff, testified as an expert on human smuggling. He explained the activities of "coyotes," or individuals who assist others in crossing the United States border illegally. He explained that the person being transported will often pay half the fee up front and make arrangements for the rest of the fee to be paid after entry into the United States. The person will often be placed in a hotel and is not free to leave until the final payment has been made. He testified that people coming into the United States with the help of a coyote are generally aware that if they attempt to leave without paying the balance due, they could get hurt or killed.

6

LEGAL ANALYSIS

1.

SUBSTANTIAL EVIDENCE SUPPORTS THE

VERDICTS ON COUNTS 1 AND 3

*Summary of the Issue*

Defendant contends that there is insufficient evidence to support his convictions on counts 1 and 3 for making criminal threats against Garcia and Gonzalez, respectively. Initially, he contends that the "alleged threat to 'watch your back' made to both Gonzalez and Garcia was missing any physical manifestation to demonstrate [that] the 'threat' was to commit a crime involving great bodily injury or death, or that it was unequivocal, unconditional, immediate, or specific enough to convey the immediate prospect of physical harm" and that the threat therefore did not meet the requirements of a "true criminal threat." Later, he restates his contention as follows: That "watch your back," "I know what you drive," "you're messing with my money," and "I'll be watching what you're doing" do not qualify as criminal threats because they "failed to convey an imminent threat of death or great bodily injury, they were ambiguous on their face, and were not specific as to physical harm."[4] He does not cite any authority that a "true

_____

**4** Section 422, subdivision (a), provides for punishment of any person "who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of

*[footnote continued on next page]*

criminal threat" requires a "physical manifestation," and we are not aware of any such authority. On the contrary, section 422 explicitly defines a criminal threat as a verbal threat. (§ 422, subd. (a).) Accordingly, we will address defendant's contention that the threats failed to convey an imminent threat of physical harm because they were ambiguous and nonspecific.

*Standard of Review*

Although defendant couches his argument in terms of the substantial evidence rule, his argument is not that the evidence fails to support the finding that he made the statements attributed to him. Rather, his contention is that the statements he quotes do not amount to criminal threats as a matter of law, based on the undisputed evidence. The legal sufficiency of undisputed evidence to support a conviction is a question of law, which we decide de novo. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 316, fn. 3; see *In re Ryan D.* (2002) 100 Cal.App.4th 854, 862 [once historical facts are established, whether statement constitutes criminal threat is question of law].)

*The Threats Were Sufficiently Unequivocal, Unconditional, Immediate, and Specific to Constitute Criminal Threats*

Although section 422, subdivision (a), requires that the threat must be "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,"

---

*[footnote continued from previous page]*
*[footnote continued from previous page]*
the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety . . . ."

courts have construed that language, which includes the qualifier "so," to mean that the test is "whether, in light of the surrounding circumstances, the communication was *sufficiently* unequivocal, unconditional, immediate, and specific as to convey to the victim a gravity of purpose and immediate prospect of execution." (*In re Ryan D.*, *supra*, 100 Cal.App.4th at p. 861, citing *People v. Bolin* (1998) 18 Cal.4th 297, 340; accord, *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1537-1538.) Further, the communication and the surrounding circumstances are to be considered together to determine whether that test is met: "'[I]t is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422.' [Citation.]" (*In re Ryan D.*, at p. 860.)

Here, even though defendant's words did not unambiguously state that he would harm either Garcia or Gonzalez, the circumstances under which the statements were made render them sufficiently unequivocal and specific to convey defendant's gravity of purpose. As to Garcia, Zavaleta told him that she had been kidnapped and that the people who had kidnapped her had threatened her. Zavaleta asked Garcia to help her escape. Zavaleta was very upset and frightened. When defendant and one of his companions approached Garcia, defendant looked angry. He asked if Garcia had seen Zavaleta and offered him money if he told him where Zavaleta was. He told Garcia that he had "crossed" Zavaleta. Garcia knew that people who "crossed" others could be dangerous. When Garcia said he did not know where Zavaleta was, defendant told him to "watch [his] back." Garcia testified that phrase, when used by someone other than a friend or relative, has a threatening connotation, and that he felt threatened when defendant said

9

it.[5] Garcia was additionally frightened when he saw defendant come out of the motel office looking even angrier than before.

Gonzalez too testified to circumstances which were sufficient to cause her to view defendant's words as a threat. When Garcia brought Zavaleta into the motel office, Zavaleta was "really, really bad," crying, yelling, asking for help. She appeared to be "really afraid." Zavaleta said she was "scared for her life," that she was being held against her will, and that "they were hurting her in that room." When defendant came into the office, he told Gonzalez, "I know you have her. Tell me where she's at. I will be—I'll be watching what you're doing. I know what you drive." He also said words to the effect of "watch [your] back." He also said that Gonzalez was "messing with [his] money." Gonzalez felt threatened by the exchange, especially when she saw via the security camera that defendant and his companions appeared to be searching the parking lot. Gonzalez felt that they would "do something" to her if she did not give Zavaleta back to him, and she was also frightened when the two other men came into the office after defendant left. They cussed at Gonzalez and demanded to know where Zavaleta was. They said they knew Gonzalez had Zavaleta. Gonzalez felt threatened because of "the way they were being, their faces, their actions, how they were." Gonzalez's

---

**5** It is not true that Garcia first said that "watch your back" is a threat and then later corrected himself to say that it actually means "take care of yourself," as defendant asserts. Rather, he testified that the phrase has both meanings, and that when it is said by a stranger, it has a threatening connotation. He explained, "I took it as a threat. Because he's not my friend. He's not my relative. He's an unknown person. And if an unknown person says that to me, I take it as a true threat."

interpretation that she had been threatened with bodily harm was reasonable, based on Zavaleta's obvious fear and the threatening demeanor of defendant and his companions.

Defendant's statements were also sufficient, under the circumstances, in conveying his intention to carry out his threats immediately if Garcia or Gonzalez failed to tell him where Zavaleta was hiding.  That the statements were effectively conditioned on Garcia and Gonzalez's failure to cooperate with him does not render them unconditional or lacking in immediacy within the meaning of section 422.  Most threats *are* conditional, in that they are designed to coerce the victim to do something or refrain from doing something, and it is well established that a conditional threat can support a conviction under section 422.  (See *People v. Melhado*, *supra*, 60 Cal.App.4th at p. 1538 ["A threat is made to convince the victim to do something 'or else.'"].)

For example, in *People v. Brooks* (1994) 26 Cal.App.4th 142, this court held that a threat to kill a crime witness if she testified constituted a criminal threat.  After discussing the federal antecedents of section 422, we held that conditional threats are true threats "if their context reasonably conveys to the victim that they are intended, and the First Amendment is not implicated by such threats since they do not concern political or social discourse or the so-called marketplace of ideas." (*Brooks*, at pp. 148-149.)  We held that if the fact that a threat is conditioned on something occurring renders it not a true threat, there would have been no need to include in the statute the word "so."  (*Id*. at p. 149.)  Under the approach advocated by the defendant in that case, we held, "every threat that is conditional would go unpunished, no matter how much fear is reasonably felt by the victim.  This would lead the way to such an absurdity as excluding from the statute's

11

prohibition the threat, 'If the sun rises tomorrow, I will kill you.' Such a result clearly undermines the purpose of the statute." (*Id*. at p. 149.)

*People v. Stanfield* (1995) 32 Cal.App.4th 1152 agreed with *People v. Brooks*, *supra*, 26 Cal.App.4th 142. The court held that section 422 "focuses on the effect of the threat on the victim, to wit, communication of a gravity of purpose and immediate prospect of execution of the threat." (*Stanfield*, at p. 1158.) This is consistent with the holding in *U.S. v. Kelner* (2d Cir. 1976) 534 F.2d 1020, which is the source of the language used in section 422, and with subsequent federal cases construing the same language. Those cases concur that the phrase "so unconditional" focuses on whether the language used by the defendant is a serious expression of intent to inflict injury and could reasonably induce fear in the victim. (*Stanfield*, at pp. 1159-1162; *Brooks*, at pp. 145-149.) The circumstances surrounding defendant's statements to both Garcia and Gonzalez meet those criteria.

The same analysis applies to the element of immediacy. As used in section 422, the phrase "so . . . immediate" means "that degree of seriousness and imminence which is understood by the victim to be attached to the *future prospect* of the threat being carried out, should the conditions not be met." (*People v. Melhado*, *supra*, 60 Cal.App.4th at p. 1538.) For the reasons we have previously discussed, defendant's statements to Garcia and Gonzalez were sufficient to cause the victims to believe that defendant would kill or seriously injure them if they did not tell him where Zavaleta was.

12

## 2.

## THE RULE OF LENITY DOES NOT APPLY

## TO COUNTS 1 AND 3

Section 422 makes criminal a threat which "causes [the victim] reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety." (§ 422, subd. (a).) Defendant contends that this means that the threat—the words spoken—must be the "but-for" cause, or the sole cause, of the fear the victim felt. He contends that his convictions on counts 1 and 3 must be reversed because the evidence shows that his threats were not the but-for cause of the victims' fear, in that their fear was based in part on factors other than his words, such as the conduct of his companions. Relying on *Burrage v. United States* (2014) ___ U.S. ___ [134 S.Ct. 881] (*Burrage*), defendant contends that "both traditional rules of statutory construction and the federal constitution require section 422 be read to require a threat be the 'but-for' cause of the victim's fear, not just a substantial contributing factor." He contends that interpreting section 422 to permit a conviction based on a finding that the defendant's words were merely a substantial factor in causing the victim's fear "would render the statute unconstitutionally vague" because it would violate the rule of lenity.

The rule of lenity is based on the due process requirement of adequate notice as to what constitutes a prohibited act. It prohibits any interpretation of an ambiguous criminal statute in a way that operates to the disadvantage of the defendant. (*Robers v. United States* (2014) ___ U.S. ___, ___ [134 S.Ct. 1854, 1859]; *People ex rel. Green v. Grewal* (2015) 61 Cal.4th 544, 565-566.)

13

In *Burrage*, the defendant was convicted of drug trafficking under a provision which provides for an enhanced penalty if the sale of heroin results in death. The evidence, however, showed that the victim's ingestion of heroin was not a but-for cause of his death but merely a contributing factor, because the victim had ingested multiple drugs which in combination resulted in his death. There was no evidence that but for his ingestion of the heroin, he would not have died. (*Burrage*, *supra*, ___ U.S. ___ [134 S.Ct. at pp. 885-887].) The Supreme Court held that because the statute did not otherwise define "'results from,'" the term must be applied using its ordinary meaning, i.e., when it arises as an "'effect, issue, or outcome *from* some action, process, or design.'" (*Id*. at p. ___ [134 S.Ct. at p. 887].) Accordingly, the statute could not be interpreted to apply merely because the heroin contributed to the person's death, even substantially, without running afoul of the rule of lenity.[6] (*Burrage*, *supra*, ___ U.S. ___ [134 S.Ct. at pp. 887-891].)

_____

[6] The California Supreme Court applies the substantial factor test of causation under certain circumstances. In *People v. Jennings* (2010) 50 Cal.4th 616, the California Supreme Court stated, "'But for' or 'sine qua non' causation provides that '[t]he defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it.' [Citation.] By comparison, the 'substantial factor' rule for concurrent causes 'was developed primarily for cases in which application of the but-for rule *would allow each defendant to escape responsibility because the conduct of one or more others would have been sufficient to produce the same result*.' [Citation.] As we have stated in the civil context, the tests for 'but for' and 'substantial factor' causation usually produce the same result, but the 'substantial factor' standard states a clearer rule that subsumes and reaches beyond the 'but for' test to more accurately address situations *in which there are independent concurrent causes of an event*." (*Id*. at pp. 643-644, italics added.) *Burrage* states that this is a minority view. (*Burrage*, *supra*, ___ U.S. ___ [134 S.Ct. at pp. 890-891].) Defendant argues that section 422 is unconstitutional because it allows conviction if the defendant's words are merely a substantial factor in causing the victim's fear, but as we discuss below, that is not the case.

14

The *Burrage* analysis does not apply to section 422 with respect to causation, however, because section 422 expressly defines the threat as both the defendant's words and the surrounding circumstances: A criminal threat is a "statement . . . which, on its face and under the circumstances in which it is made" is so unequivocal, et cetera, as to convey a gravity of purpose and an immediate prospect of execution. (§ 422, subd. (a).) Because the circumstances surrounding a defendant's statements to the victim, including any intimidating conduct by his companions, are expressly made part and parcel of the threat, defendant is mistaken that the words alone must be the but-for cause of the victims' fear. Moreover, the rule of lenity applies only if, "after using the usual tools of statutory construction, we are left with a 'grievous ambiguity or uncertainty in the statute.' [Citation.]" (*Robers v. United States*, *supra*, ___ U.S. ___ [134 S.Ct. at p. 1859]; see *People ex rel. Green v. Grewal*, *supra*, 61 Cal.4th at pp. 565-566 [lenity applies only where "two reasonable interpretations of a penal statute stand in relative equipoise"].) Because section 422 explicitly defines a threat in terms of both the words used by the defendant and the circumstances under which they were uttered, it is not ambiguous in this respect. Accordingly, the rule of lenity does not apply.

3.

## SUBSTANTIAL EVIDENCE SUPPORTS THE FELONY

## FALSE IMPRISONMENT VERDICT

Defendant contends that his conviction for felony false imprisonment must be reversed because there is insufficient evidence to support the jury's finding that he used violence or menace to restrain Zavaleta from leaving the motel room.

15

False imprisonment is the unlawful violation of the personal liberty of another. (§ 236.)  It is a felony if it is effected by violence, menace, fraud or deceit.  (§ 237, subd. (a).)  Here, the jury was instructed solely on violence or menace.  Violence is defined as the use of physical force greater than is reasonably necessary to restrain the victim, while menace is defined as a threat of harm, either express or implied.  (*People v. Newman* (2015) 238 Cal.App.4th 103.)  The Attorney General concedes that there is no evidence that defendant or his accomplices applied any physical force to restrain Zavaleta.  She contends, however, that defendant's words and conduct toward Zavaleta constituted menace within the meaning of section 237.

When a defendant challenges the sufficiency of the evidence to support a conviction, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Thompson* (2010) 49 Cal.4th 79, 113.)  The standard is the same under the state and federal due process clauses.  (*Ibid.*)  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  (*Ibid.*)  This standard applies whether direct or circumstantial evidence is involved.  (*Ibid*.)

Part of defendant's premise appears to be that there is insufficient evidence to sustain his conviction because there was no evidence that he personally threatened Zavaleta, either expressly or implicitly, with harm if she left the motel room.  Rather, Zavaleta testified that "they" threatened to kill her if she did not pay and that "they" told

16

her they would not let her leave until they got their money. She did not testify that defendant personally made either statement. On the contrary, she testified that defendant never threatened to hurt her. It was not necessary for the prosecution to prove that defendant personally restrained Zavaleta by threatening her, however. "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." (§ 31.) Zavaleta testified that defendant drove the van and that he and two other men participated in bringing her into the United States from Mexico. She said that they worked for the "bosses," who were in Mexico. Defendant was in charge, and "the other guy" obeyed defendant's orders. This evidence, along with the evidence of defendant's words and actions in trying to recover Zavaleta, and the other witnesses' observation that defendant was the one in charge, is substantial evidence supporting the conclusion that regardless of which of the men threatened Zavaleta, if any of them actually did, defendant was a participant in the crime and thus criminally liable.

Defendant's primary contention is that his conviction must be reversed because there is no evidence that Zavaleta was threatened in any way, by anyone. He contends, essentially, that any threat of harm was a figment of Zavaleta's imagination. Moreover, Zavaleta expressly denied having been restrained. Defendant's approach is too simplistic because even though Zavaleta ultimately denied that she was held against her will, we cannot say as a matter of law that no rational juror could conclude, based on the totality of her testimony and on other evidence, that Zavaleta was indeed restrained by express or implied threats of harm.

17

The first part of Zavaleta's testimony reflected that she was restrained against her will by express or implied threats. She identified defendant as a "person that did a lot of bad things" to her. She said that "they" told her she could not leave the room until they got their money and that "they" threatened to kill her if she did not pay but, nevertheless, they would not let her contact her family to arrange for payment. Zavaleta said she could not leave the room or even look out the window, and that she was afraid "because there were three of them" and they were "very drugged." Defendant's accomplice at one point told her not to look out the window "or I'm going to f[---] you up." She understood that she could be hurt if defendant or his companions did not get their money, and that she could not have left the motel room if she had wanted to because until they got the money, they would not allow her to leave. Further, she said, "And you know that [i.e., that you would not be allowed to leave without paying] when you cross the border because you know what you're getting into if you don't have the money. . . [¶] . . . they would kill me." Zavaleta said that she left the room only because it appeared that they were preparing to take her somewhere else and that she was afraid she would be raped if they did take her.

If this had been the extent of Zavaleta's testimony, it would unquestionably constitute substantial evidence that she remained in the room out of fear that the men would harm her as they had threatened and as she knew based on her prior knowledge of how coyotes operate. However, Zavaleta went on to say that no one threatened to kill her or hurt her if she left the motel room, that she did not really want to leave because she had the money to pay them, and that she wanted to pay them because she is a "person

18

with honor," i.e., someone who pays her debts. Zavaleta said that she would not hesitate to leave the room if it were a matter of saving her life, but that leaving the room *would* risk her life because they would think she did not want to pay. Then again, she said she did not think about whether they would hurt her if she left the room. Finally, Zavaleta said she was afraid of their behavior, but they were not keeping her in the room against her will. These contradictions arguably call into question whether Zavaleta's initial assertion that she was threatened and held against her will is truly substantial evidence.

Nevertheless, the jury could properly conclude from Zavaleta's testimony and other evidence that she was indeed held against her will by threats of harm if she left. A witness's testimony consists of more than words. It also consists of demeanor, body language and other intangibles from which jurors can draw inferences that are not apparent from the transcript. (*Meiner v. Ford Motor Co.* (1971) 17 Cal.App.3d 127, 140-141; Evid. Code, § 780 [the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to a witness's "demeanor while testifying and the manner in which he testifies"].) A witness's demeanor is itself ""'"part of the evidence"'"" and is "''of considerable legal consequence.'" (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358.) However, because a reviewing court does not see the witness testify, we cannot assess the effect of the witness's demeanor on the verdict and must defer to the jury to determine the witness's credibility. (*Meiner v. Ford Motor Co.*, at pp. 140-141; *People v. Young* (2005) 34 Cal.4th 1149, 1181 [appellate court does not resolve questions of witness credibility].) For these reasons, we cannot

look merely at Zavaleta's transcribed words to determine whether her testimony rationally supports the conclusion that she was held against her will by menace. Zavaleta's demeanor on the witness stand may have caused jurors to conclude that she was equivocating because she was afraid of repercussions from the "bosses" in Mexico if she testified forthrightly that defendant and his companions threatened to kill her if she did not pay.

This inference is also supported by other evidence: Dario Hernandez, a deputy sheriff and expert on human smuggling testified that it is fairly common knowledge among people who use coyotes to transport them into the United States that they are likely to be killed if they do not pay. And, victim Garcia also testified that he was aware that coyotes could be dangerous. Further, Zavaleta said her parents, who were still in Mexico, were being asked about the money by the person who "recommended" her, and that she feared for her family's safety. From all of this evidence, jurors could reasonably infer that the part of Zavaleta's testimony in which she said she knew she could not leave without paying and that she would be at risk of injury or death if she did leave before they got their money was truthful, and that her later denial that she was being held against her will was false.

In addition, in determining whether there has been an express or implied threat of harm, the trier of fact "'properly may consider a victim's fear.'" (*People v. Newman*, *supra*, 238 Cal.App.4th at p. 121.) Garcia testified that when Zavaleta opened the door part way and asked for his help, she was very scared and was shaking. She told him that she had been kidnapped. She later said "they" had threatened her and that "they" were

20

"very bad." Gonzalez testified that when Garcia brought Zavaleta into the office, Zavaleta told her she was "scared for her life," and that she was crying and yelling. Zavaleta said that "they" were going to "do something" to her, and that they would not let her out. Zavaleta told Gonzalez that "she was in there against her own will." She was "really, really bad." She was crying and yelling and hugging Gonzalez and asking Gonzalez to "please help her." Gonzalez testified that Zavaleta was "really afraid." Even though Zavaleta's testimony may have been equivocal as to whether she was restrained against her will or merely waiting patiently for someone to pay defendant, the degree of fear she displayed to Gonzalez and to Garcia is substantial evidence from which the jury could rationally infer that she was kept in the motel room by fear instigated by defendant and his companions, even in the absence of any evidence as to the particular threats or intimidation that caused Zavaleta to fear for her life.

Taken all together, despite Zavaleta's denial that she was held against her will, the evidence rationally supports the conclusion that she was restrained by means of express or implied threats of harm. Accordingly, defendant's contention fails.

4.

ANY INSTRUCTIONAL ERROR WAS HARMLESS

Defendant contends that the standard jury instruction on false imprisonment, which was given in his trial, is deficient because it fails to instruct the jury that it must determine whether the victim was unlawfully restrained for an appreciable length of time. He contends that this constitutes the omission of a necessary statutory element and that

21

the error is reversible per se or, in the alternative, under the harmless error analysis of *Chapman v. California* (1967) 386 U.S. 18.

We disagree with defendant's essential premise that confinement for an appreciable length of time is an element of criminal false imprisonment. In *Fermino v. Fedco*, *Inc.* (1994) 7 Cal.4th 701, the California Supreme Court stated: "The crime of false imprisonment is defined by Penal Code section 236 as the 'unlawful violation of the personal liberty of another.' The tort is identically defined. [Citation.] As we recently formulated it, the tort consists of the "'nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short.'" [Citation.] That length of time can be as brief as 15 minutes." (*Id*. at p. 715.) Defendant relies on that statement to contend that "an appreciable length of time" is an element of the criminal offense. We note, however, that in *Fermino v. Fedco*, *Inc*., the court's reference to the criminal offense was by way of introduction to a discussion of the tort of false imprisonment and that the opinion does not address any contention that duration is or is not an element of the criminal offense. A case "'is not authority for everything said in the court's opinion but only "for the points actually involved and actually decided."'" [Citation.]" (*People v. Knoller* (2007) 41 Cal.4th 139, 154-155.) Accordingly, the statement defendant relies upon is dictum. Moreover, it is inconsistent with the court's prior holding that "'[t]he offense of false imprisonment consists of two elements, the violation of another's personal liberty, and the unlawfulness of such violation.' [Citation.]" (*People v. Agnew* (1940) 16 Cal.2d 655, 664; accord, *People v. Zilbauer*

22

(1955) 44 Cal.2d 43, 51.)  We have found no cases containing an authoritative holding that an appreciable time element is part of section 422.

In any event, even if we assume that an appreciable length of time is an element of section 422, the omission of that element from the jury instruction does not require reversal.  Failure to instruct on a single element of an offense may be found harmless under the federal Constitution if it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.  (*Neder v. United States* (1999) 527 U.S. 1, 15, citing *Chapman v. California*, *supra*, 386 U.S. at p. 24.)  Only in rare cases can such an error be deemed structural, requiring reversal without regard to prejudice.  (*People v. Mil* (2012) 53 Cal.4th 400, 416-417.)

"*Neder* instructs us to 'conduct a thorough examination of the record.  If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.'  (*Neder*, *supra*, 527 U.S. at p. 19.)"  (*People v. Mil*, *supra*, 53 Cal.4th at p. 417.)  "On the other hand, instructional error is harmless 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.'  [Citations.] Our task, then, is to determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.'  [Citation.]"  (*Ibid.*)

Here, defendant did not contest the sufficiency of the length of time Zavaleta was detained against her will. Rather, his contention was that there was no violence or menace and that Zavaleta was not involuntarily detained in any event. He did not adduce any evidence pertaining to the length of time she was detained. But there was overwhelming evidence that she was detained illegally for an appreciable length of time. "Appreciable" means merely "large enough to be noticed or measured." (<http://www.merriam-webster.com/dictionary/appreciable> [as of June 10, 2016].) Here, the evidence showed that Zavaleta spent the night at the motel and did not leave the room until the following morning, when she asked Garcia to help her. By any measure, this is an appreciable length of time, and defendant does not argue otherwise. Consequently, we can say beyond a reasonable doubt that had the jury been asked to decide whether Zavaleta was held against her will for an appreciable length of time, it would have found that she was. Accordingly, the omission of the time element from the instruction did not contribute to the verdict.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.

24